**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: | C/A No. 15-05744-DD |
| Elizabeth Delander Eaddy, | Chapter 13 |
| Debtor. | ORDER DENYING CONFIRMATION |

This matter comes before the Court on the objection of 21st Mortgage Corporation as attorney-in-fact for Associates Housing Finance LLC ("21st Mortgage") to confirmation of a chapter 13 plan filed by Elizabeth Delander Eaddy ("Debtor"). 21st Mortgage objects that the plan does not satisfy the requirement of 11 U.S.C. § 1325(a)(5)(ii) in that it does not pay the allowed amount of the value of its secured claim and, if the plan were to be amended to correct the value of the claim, is not feasible as required by 11 U.S.C. § 1325(a)(6).[1] For the reasons set forth below the Court sustains the objection in part and values the mobile home at $29,595. Confirmation of the October 28, 2015 plan is denied.[2] No determination of feasibility is made as the issue was not argued. The Court will enter its form order CII in connection with this opinion.

**I.    Facts and Procedural History**

1.    Debtor filed for protection under chapter 13 of the bankruptcy code on October 28, 2015.[3] Debtor scheduled in her petition a 1998 Southern Energy Lifestyle

---

[1] Further references to be bankruptcy code, 11 U.S.C. § 101 *et seq.*, will be by section number only.

[2] The Court has jurisdiction in this proceeding pursuant to 11 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (K), and (O).

[3] Docket 1.

Entered: 02/23/2016                  1

Doublewide Mobile Home as personal property valued at $16,281.97.[4] She scheduled a $66,598 debt owed to 21st Mortgage secured by the mobile home.

2. Debtor's schedules also indicate that she is unemployed and that her only income is $1,409 per month from social security. Her expenses total $870 per month, leaving $539 in monthly net income.

3. Debtor filed a plan the same day as her petition.[5] The plan provides for payments of $520 per month for 52 months. These payments are for the mobile home, Debtor's car, and Debtor's attorney fees. The plan values the mobile home at $16,281.97 and states that 21st Mortgage will receive payments of $319 per month along with 5.25 percent interest on the value of its secured claim. The plan currently filed anticipates paying one percent to unsecured creditors.[6]

4. 21st Mortgage filed a proof of claim on November 2, 2015.[7] The proof of claim evidences a debt totaling $69,981.76.

5. Attached to 21st Mortgage's proof of claim is a "Manufactured Home Retail Installment Contract/Security Agreement" dated December 29, 1997. Page one of the contract states that the buyer of the manufactured home has been quoted a price "for the manufactured home described on page 4 together with the furnishings, equipment, appliances and accessories included in the manufactured home at the time of purchase." Page two of the contract indicates that the buyer is giving a security interest in the

---

[4] She valued the mobile home on real property with a tax appraisal value of $23,779. The parties agree that the mobile home is not affixed to the land and therefore is properly considered under South Carolina law as personal property.

[5] Docket 6.

[6] Docket 12, Plan summary.

[7] Claim 1-1.

manufactured home for the amount of the purchase price being financed. Page four of the contract contains a box labelled "Description of Manufactured Home":

```
DESCRIPTION OF MANUFACTURED HOME
New [X]  Used [ ]              Additional Accessories And Furnishings
                                Item                    Serial #
Trade Name  SOUTHERN LIFESTYLE
Year 1998   Model LS-409
Length 66   Width 32
Serial No. DSL2AL29668A&B
Serial No. _____

Proposed Location of Manufactured Home  3961 MARION ST JOHNSONVILLE SC 29555-
Telephone No.
```

    6.    Underneath the box, the contract states "Buyer hereby grants Seller a security interest in … the Manufactured Home and in all goods that are or may hereafter by operation of law become accessions thereto."[8]

    7.    The parties agree that 21st Mortgage holds a valid lien on the Debtor's mobile home.[9]

    8.    21st Mortgage filed an objection to Debtor's plan on November 19, 2015,[10] and contends that the value of the mobile home is $38,500.[11] 21st Mortgage also argues that if the value were increased, the plan would not be feasible.

---

[8] The remaining portion of this paragraph relates to whether the manufactured home is attached to real property, thus is not applicable.

[9] Docket 15.

[10] Docket 8.

[11] Docket 15. 21st Mortgage did not include a proposed value in its original objection.

9. The parties agreed prior to the hearing that "the sole issue before the Court is the value of 21st Mortgage's secured lien."[12]

10. The Court held a hearing on the matter on February 8, 2016. Both parties presented experts in support of their respective values.[13]

11. Debtor presented Karen B. Newton, a licensed residential real estate appraiser.[14] Ms. Newton obtained her real estate license in 1979 and became a licensed appraiser in 1992. Although she is not specifically licensed for mobile home appraisals, she has taken continuing education courses on mobile home appraisals and about a quarter of her work involves appraising manufactured homes.[15]

12. Ms. Newton testified that she usually uses a comparison sales approach valuation method. This method looks at comparable sales in the area and adjusts the values of those sales based on the specifics of the home being valued. She testified that in this instance she used the standard manufactured home appraisal forms that most lenders require when financing homes. She acknowledged, on cross examination, that these forms are more frequently used when valuing manufactured homes affixed to land.

13. Ms. Newton noted that it was difficult to find comparable sales in the area because most of the sales involved both the mobile home and the land. She explained that to adjust for this, she discounted value from the comparable sales she used based on land

---

[12] Docket 15.

[13] Debtor had no objection to 21st Mortgage's expert, however, 21st Mortgage did object to the Debtor's expert as lacking in qualification because she is not specifically licensed in mobile home valuation. The Court overruled the objection, stating that the differences in the qualifications between the two experts would go to the evidentiary weight of their opinions.

[14] Both experts testified as to their qualifications and did not submit resumes to the Court.

[15] Ms. Newton acknowledged that her prior mobile home appraisals frequently involved manufactured homes and the real property to which they are affixed.

4

values from the tax assessor's office. She testified that the software she uses for her appraisals generally makes these adjustments for her.

14. Ms. Newton's first comparison to Debtor's mobile home is of a 23-year-old 2,432 square foot mobile home with 1 acre of land. After discounting for the value of the land and various differences between the two homes, she valued the mobile home at $17,050. The second comparable is 15-year-old 1,650 square foot mobile home with 1.7 acres. After discounting, she valued the mobile home at $24,370. Her third comparable is a 6-year-old 1,200 square foot mobile home with 14.7 acres of land; after adjustments she valued it at $25,370. She weighed each comparable value to accord with the Debtor's 18-year-old 1,937 square foot mobile home, and concluded that the value of the Debtor's mobile home based on these comparable properties is $21,800. She stated on cross-examination that she did not have personal knowledge of the comparable properties she used, and did not know the specific differences between the Debtor's mobile home and the comparable mobile homes. She did personally inspect the Debtor's mobile home.

15. Ms. Newton also used the cost approach in her valuation. For the cost approach, she measured the interior square footage of the mobile home as 1,937 square feet. She multiplied that by $43.51, a number she obtained from a cost manual and local contractors' estimations of the cost to rebuild per square foot. She added on $10,038 for various amenities, then discounted the total amount by a physical depreciation modifier and an external depreciation modifier. Her total value based on the cost approach came to $51,601.

16. 21st Mortgage presented testimony from Walter Banks. Mr. Banks has been involved in the mobile home industry, most notably through financing mobile homes, since

5

1969. He is not a licensed appraiser but is instead certified in manufactured housing valuation without a land component.

17. Mr. Banks used an appraisal worksheet from the National Appraisal System, which utilizes the NADA Manufactured Housing Appraisal Guide to appraise mobile homes. The appraisal states that comparable sales should be used when available, but in the absence of comparable sales, the worksheet should be used to determine fair market value. Mr. Banks explained that he did not think reliable, comparable sales were available in the area, thus his cost estimate was a more reliable approach. He later explained that the values in the worksheet from the NADA national database were based on national comparable sales.

18. Mr. Banks testified that this mobile home is a "top of the line" home.

19. Mr. Banks explained that his appraisal, similar to an automobile appraisal, begins with the "box." This process assumes that all homes start off the same way: metal roofs and siding, linoleum floors, and basic windows. He measured the size of the home based on the exterior size, 32 by 66, and multiplied that size by a value from the NADA database, giving him a "base value" of $26,813.08. He subtracted from this number an amount based on the fact that the home is not a pure rectangle, resulting in $25,460, rounded to $25,500.

20. He then discounted this number based on the condition of the interior of the mobile home. His assessment of the interior of the home came from personal knowledge of the home and speaking with the Debtor. His appraisal report included a breakdown of the condition of each room, ultimately concluding that the condition of the home was "good." He testified that this assessment did not consider any sort of repairs or value that

6

would need to be added to make the home like new. He used a 95 percent multiplier, based on the NADA's system, to discount the house for being less than like-new.

21. Mr. Banks testified that he did not adjust the value for location because according to NADA, the South Carolina mobile home market is neither inflated nor deflated. He additionally testified, however, that mobile homes are generally appreciating in value because the cost of new mobile homes has increased enough that most people in the mobile home market cannot afford a new mobile home, thus the cost of used mobile homes is increasing.

22. He then discounted the cost of repairs of the home, which were very minimal, totaling $335.

23. Next, he explained he looked at additions to the cost of the "box" based on the "components" and "accessories." The worksheet for "components" showed increased values for a house-type roof, vinyl siding, storm windows, carpeting, two full bathrooms, side-by-side refrigerator, ice maker, range, built-in dishwasher, furnace, wash-dryer, water heater, drapes/curtains, fireplace, and smoke detectors. The values of these additions were depreciated out to five years. Mr. Banks testified that there is no additional depreciation, until an item becomes unusable, after five years.

24. Mr. Banks stated that the kitchen appliances all came with the home and would go with the home. He additionally stated that furnaces generally come with the home. He also noted that there was an added cost in his appraisal for the fact that the furnace was "air conditioner ready." He did not think "they manufactured those anymore," but explained this type of furnace was able to have an air conditioner attached to it.

25. The total of these components was $6,242. He testified that about 40 percent of mobile homes do not come with many of these components, particularly the kitchen appliances, because the buyers of the home have their own.

26. He then explained the accessories, which are parts of the home but are "not added to the box." These components included a 3-ton air conditioner, a large porch and some steps, and the underpinning of the mobile home. The total value of the accessories was $2,403.

27. Finally, he added to this value, based on information from the NADA, the cost of delivering and setting up the home. He estimated these costs to be $6,000.

28. These costs added together resulted in the total value of the mobile home being $38,500.

29. Mr. Banks then discussed the comparable properties used by Ms. Newton.

30. He stated that for the first comparable, his research indicated the home itself actually sold for $24,000 and the land was sold in foreclosure. He opined that the mobile home in that comparable was "one step lower" than the one being valued here.

31. With respect to the second comparable, he stated that he did not have enough information about the mobile home to determine its value. He testified that contrary to Ms. Newton's valuation, his research indicated that the property was sold in foreclosure for $2,500 and the mobile home was valued by the lender at $27,500.

32. As to the third comparable, he again testified that the comparison is problematic. He opined that the mobile home there is a low-end, cheaply constructed, single-wide mobile home on a large parcel of property, and that this situation was not at all

comparable to the Debtor's mobile home, which is a double-wide, well-built, higher-end mobile home.

33. On cross-examination, Debtor's counsel pressed Mr. Banks as to how he came up with the values in his report, and he asserted that based on sizes and his assessment of the condition, the NADA provided a value. He could not explain why certain values changed from his previous appraisal of the property. He did testify that he was surprised the value had not increased on the mobile home.

34. He also testified that the values in the components are not pure "replacement" values because these values did not represent the cost to replace these various components. Instead, these values were meant to represent the "as-is" value. Each component is valued at the lowest value of the component as a functional component.

35. Finally, he agreed that there was "something" worked into these costs that was an intangible not accounted for – a warranty, service contract, or the like. His best guess was that this value would be around $1,000.

## II. Discussion

The issue in this case is whether Debtor's plan meets section 1325(a)(5)(B)(ii)'s requirement that the plan pay the present value of 21st Mortgage's allowed secured claim. Utilization of this code provision is colloquially referred to as "cram down." *See Associates Com. Corp. v. Rash*, 520 U.S. 953, 955 (1997). In order to invoke the cram down option, the debtor, frequently through the filing of a plan of reorganization, proposes a value of the secured portion of a creditor's lien to be paid over the life of the plan while the debtor retains the collateral. The unsecured portion of the creditor's debt is then paid at the same percentage as general unsecured creditors, and discharged if the plan payments are

completed. Debtors generally bear the burden of proof on plan confirmation. *In re Namie*, 395 B.R. 594, 596 (Bankr. D.S.C. 2008).[16]

Because cram down requires determining the value of the secured portion of a creditor's debt, consideration of whether a plan meets this requirement shifts the inquiry to section 506(a). The parties agree that the property in question is personal property under South Carolina law, thus the relevant bankruptcy code provision is section 506(a)(2):

> If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

This statutory text partially codified the Supreme Court's ruling in *Rash*, 520 U.S. 953 (1997). *Rash* considered a circuit split as to "the proper application of § 506(a) …

---

[16] There is some dispute in the case law as to who bears the burden of proof in scenarios such as the one here. Although the debtor generally bears the burden of proof on the elements of confirmation, confirmation of the plan when there is a dispute over the value of collateral "implicates claim allowance" because it requires a determination of the value and extent of a secured claim. *In re Coleman*, 373 B.R. 907, 911 – 13 (Bankr. W.D. Mo. 2007) (superseded by statute on other grounds). Most courts, including this one, utilize a burden-shifting framework when determining the amount of a claim. *Stancill v. Harford Sands Inc. (In re Harford Sands Inc.)*, 372 F.3d 637, 640 (4th Cir. 2004). First, based on the language in section 502(a) ("A claim … is deemed allowed … unless a party … objects") and Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim"), the proof of claim is presumptively valid. The party objecting to the amount of the debt "must introduce evidence to rebut the claim's presumptive validity." *In re Gregg*, 528 B.R. 645, 651 (Bankr. D.S.C. 2014). The creditor bears the ultimate burden by the preponderance of the evidence in proving both the amount and validity of the claim. *Id*. This burden-shifting framework has been held to apply in the context of valuing the extent of a secured claim due to the need to consider value based on the proposed use and disposition of the collateral. *In re Heritage Highgate, Inc.*, 679 F.3d 132 (3d Cir. 2012) (considering burden-shifting pursuant to section 506(a) in a chapter 11 case when value was not an issue for confirmation). Courts disagree whether this same burden-shifting should apply when issues of value arise in the chapter 13 confirmation context. *In re Tucker*, Case No. 12-53285-JDW, 2013 WL 3230615, at *3 (Bankr. M.D. Ga. June 25, 2013) (slip copy) (collecting cases). Additionally, "'it is generally accepted that a party objecting to confirmation bears the burden of proof.'" *In re Krueger*, 457 B.R. 465, 475 (Bankr. D.S.C. 2011) (considering, at confirmation, whether a debt is a domestic support obligation). The parties did not discuss which of them bore the burden of proof as to this objection to confirmation.

when a bankrupt debtor has exercised the 'cram down' option." *Rash*, 520 U.S. at 955. At the time, courts were split on whether to apply (1) foreclosure value, (2) replacement value, or (3) the midpoint between the two when determining value in the chapter 13 cram down context. *Id*. In doing so, the Supreme Court noted that this inquiry necessarily requires a court to consider the value of the collateral in the context of the extent to which the security interest attaches to the collateral under state law. *See id*. at 961, 943 n.6. The Supreme Court concluded, based on section 506(a)'s language requiring consideration of the "proposed disposition or use" of the property, that the proper application of value is the replacement value. *Id*. at 962 – 65. In other words, the proper value "is the cost the debtor would incur to obtain a like asset for the same proposed use." *Rash*, 520 U.S. at 965 (citation omitted).

    a. *Extent of 21st Mortgage's Security Interest*

Although the parties only argued value at the hearing, the determination of the value of the secured portion of 21st Mortgage's lien requires the Court to look to the extent of the security interest under state law. *Rash*, 520 U.S. at 965 n.6. The security agreement attached to 21st Mortgage's proof of claim describes the collateral as "the Manufactured Home and all goods that are or may hereafter by operation of law become accessions thereto."[17] The South Carolina Commercial Code defines "accessions" as "goods that are physically united with other goods in such a manner that the identity of the original good is not lost." S.C. Code Ann. § 36-9-102(a)(1) (2016). This definition is only relevant in the commercial code to determine the priority of competing lienholders. S.C. Code Ann. § 36-

---

[17] Article 9 of the Uniform Commercial Code applies to security agreements involving mobile homes. *See Brockbank v. Best Capital Corp.*, 534 S.E.2d 688, 694 (S.C. 2000) (holding that Article 9 applies to installment sales contracts of mobile homes).

9-335 (2016). The same is true in common law: pre-commercial code, the only South Carolina case concerned with accessions attempted to reconcile the claims of competing creditors. *Goodrich Silvertown, Inc. v. Rodgers*, 200 S.E. 91, 92 (S.C. 1938) (referring to the "doctrine of accessions" to determine whether tires placed on a vehicle were accessions, ultimately determining lien priority). No cases in South Carolina have applied the "accession" definition, either pre- or post-commercial code.

In other states, most courts attempting to determine whether property is an accession examine whether the good has integrated itself into the principal property, utilizing a definition similar to the current commercial code definition:

> where … [the] principal article of personal property becomes so closely incorporated with the principal article that they cannot be identified and detached therefrom without injury … such articles become a part of ... [the] principal article to which they are so attached … But when the articles added can be readily identified and detached without injury … they do not pass by accession.

*Goodrich Silvertown Stores of B.F. Goodrich Co. v. Pratt Motor Co.*, 269 N.W. 464, 465 (Minn. 1936). *See generally* Steve H. Nickles, *Accessions and Accessories Under Pre-Code Law and U.C.C. Article 9*, 35 Ark. L. Rev. 111 (1981 – 82). Courts also consider the practical and functional utility of removing the accession from the principal article, generally finding that if the good has no utility once removed from the principal good, then it is an accession. *Id*. at 119 – 121 (collecting cases). These rules are similar to the common law rules regarding fixtures to real property. *See e.g. Carroll v. Britt*, 86 S.E.2d 612, 615 – 17 (S.C. 1955) (discussing fixtures and whether they are accessions to the land). Courts have limited the extent to which a security agreement attaches to property when the property is not an accession. *E.g., State of New Mexico v. Woodward*, 675 P.2d 1007, 1011 (Ct. App. N.M. 1983) (holding, in the context of determining criminal liability for improper

12

removal of encumbered property, that because the language in the security agreement merely identifying the model, year, and serial number of the mobile home without identifying goods such as a washer, dryer, and refrigerator, the creditor's lien did not extend to those goods, and a question of fact remained as to whether awnings were accessions and thus part of the collateral); *In re Cranford*, Case No. 12-10724C-13G, 2012 WL 5939967 (Bankr. M.D.N.C. Nov. 17, 2012) (discounting the value of a mobile home in the context of chapter 13 confirmation when the evidence demonstrated that a heat pump and wooden steps were neither covered by the security agreement's after-acquired property clause nor were accessions). Although it appears unnecessary to include the word "accessions" in 21st Mortgage's security agreement, absent proof to the contrary, it is logical to conclude that the porch, storm windows, metal skirting outside the mobile home, heating appliances, carpeting, fireplace, built-in dishwasher, and bathroom fixtures are accessions. Generally, none of these items have utility or value outside the home in which they are installed.

The distinction between what is and is not an accession to the mobile home is important here because nowhere in the security agreement is listed the various accessories and components included in Mr. Banks' valuation. The only evidence that these items were intended to be included in the security agreement is the testimony from Mr. Banks asserting that the majority of them came with the mobile home and a statement in his appraisal report that Debtor told him all the appliances were original. This evidence, unless an ambiguity exists in the security agreement, is inadmissible under the parole evidence rule. *Davis v. KB Home of S.C., Inc.*, 713 S.E.2d 799, 805 (S.C. Ct. App. 2011) ("[W]hen the writing on its face appears to express the whole agreement, parol evidence cannot be admitted to add another term to the agreement, even when the writing is silent as to the particular term.").

"The purpose of requiring a description of collateral in a security agreement … is evidentiary." S.C. Code Ann. § 36-9-108, Official Comment 2 (2016). The test is whether the description "reasonably identifies" the collateral. S.C. Code Ann. § 36-9-108(a) (2016). The Court is unaware of any statute or case law that would lead it to conclude that "manufactured home" would include anything more than what Mr. Banks identified as "the box" of the home and any accessions thereto. There is nothing in the agreement to create an ambiguity: it identifies specific collateral, and the space where other collateral can be listed is blank. Accordingly, the Court concludes that 21st Mortgage's security interest did not attach to any non-accession goods, including the kitchen appliances, air conditioner, drapes and curtains, or smoke detectors. The total value of those items, per Mr. Banks' appraisal, is $1,791.

    b. Value

Having determined the extent of the lien, the Court now considers the value of the collateral securing the lien. Although both Ms. Newton and Mr. Banks were admitted as experts, the Court finds Mr. Banks' valuation method more persuasive here. Ms. Newton's comparable properties had deficiencies that made them not comparable to Debtor's property. As detailed *supra*, none were actually comparable.

NADA valuations, such as the one performed by Mr. Banks, are utilized with increasing frequently in bankruptcy courts and are generally accepted. *See In re Gensler*, Case No. 15-10407-ta113, 2015 WL 6443513, at *4 (Bankr. D.N.M. Oct. 23, 2015) (collecting cases). Some courts have criticized the NADA process as being too automated, thus lacking flexibility to consider property-specific issues. *See e.g., In re Arendarczyk*, 2014 WL 6629770, at *5 (Bankr. S.D. Ga. Nov. 21, 2014) (favoring comparable sales as a

14

better indication of actual value rather than NADA value); *In re Meredith*, 2013 WL 4602966, at *3 (Bankr. M.D. Pa. Aug. 29, 2013) (same). While these criticisms have merit, given the paucity of truly comparable sales presented to the Court, the Court finds that here the NADA value is an appropriate starting point for value.

Courts are free to form their own opinions based on the information provided to them that does not conform precisely to the conclusion presented. *In re Fortenberry*, Case No. 14-50768, 2014 WL 7407515, at *3 (Bankr. S.D. Miss. Dec. 30, 2014) (citation omitted). Thus, while the Court generally accepts the NADA value, it does so with some adjustments. Mr. Banks testified that the NADA updated its guidelines in 2015 to include pick-up and set-up costs of manufactured homes in appraisals. Although this change is fairly recent to Mr. Banks, the inclusion of these costs in appraisals had already occurred in other jurisdictions. Courts have uniformly rejected including these costs when determining value pursuant to section 506(a). *Gensler*, 2015 WL 6443513, at * 3 (citing *In re Carlson*, 2006 WL 4811331 (Bankr. W.D. Wash. 2006)); *Fortenberry*, 2014 WL 7407515, at *4; *In re Kollmorgen*, 2012 WL 195200, at *4 n. 25 (Bankr. D. Kan. Jan. 20, 2012) (citing *Carlson*, 2006 WL 4811331). These courts reason that *Rash* rejected applying foreclosure value because doing so was inconsistent with considering the use and disposition of the property, thus value for moving collateral should not be added or subtracted when the property is not being relocated. *Id*. This Court agrees that *Rash* suggests this conclusion. The $6,000 value of the removal and set-up costs should not be included value for section 506(a) purposes. Additionally, based on *Rash*'s caution against including value for services that would be included in a resale but not held by the debtor retaining the collateral, the Court further discounts the valuation by Mr. Banks' $1,000

15

estimate for a home warranty or related retailer services that would come from a purchase. Finally, based on Mr. Banks' testimony that the air conditioner-ready furnace no longer adds value, the Court discounts the value further by $114.

### III.    Conclusion

The NADA value is the appropriate and more persuasive valuation here. 21st Mortgage's lien did not attach to the appliances in the mobile home that are neither accessions nor listed in the security agreement. The value of these items is $1,791. *Rash* requires the Court to ignore the costs of moving and setting up the mobile home in its analysis, discounting the NADA value by a further $6,000. Finally, the value is discounted $1,000 to compensate for warranties or service agreements that would be included when replacing the mobile home, and less an additional $114 for items that are no longer useful. The mobile home is valued at $29,595. The plan does not use this value and confirmation is denied.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**02/23/2016**



David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina

Entered: 02/23/2016